IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROGER ALLEN ROZZELLE,
    Petitioner,

vs.                                               Case No. 3:07cv347/RV/EMT

WALTER A. McNEIL,
    Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 and supporting memorandum (Docs. 5, 7). Respondent filed an answer asserting procedural defenses, including statute of limitations and failure to exhaust state court remedies, and substantive arguments supporting denial of the petition (Doc. 21). In compliance with Rule 5 of the Rules Governing § 2254 Cases in the United States District Courts, Respondent also submitted relevant portions of the state court record (*see* Doc. 21). Petitioner filed a reply (Doc. 24).

This matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that the petition was untimely and, therefore, should be dismissed.

I.    BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is undisputed by the parties and established by the state court record (Doc. 21, Exhibits; *see also* Doc. 24 at 1).[1] Petitioner was charged by information in the Circuit Court in and for Okaloosa County, Florida, with one count of second degree murder for the killing, by beating or kicking or both, of Greg Leier on or about July 17, 1998 (Ex. A at 5). Following a jury trial, Petitioner was found guilty as charged (Ex. A at 75; Ex. B). Petitioner was

---

[1] Hereinafter all citations to the state court record refer to the exhibits attached to Respondent's answer (Doc. 21).

adjudicated guilty and sentenced to a term of life imprisonment, with pre-sentence jail credit of 394 days (Ex. A at 109–14). Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal (First DCA) (*see* Exs. C, D, E). The First DCA affirmed the judgment of conviction and sentence per curiam without written opinion on December 15, 2000 (Ex. F). Rozzelle v. State, 773 So. 2d 543 (Fla. 1st DCA 2000) (Table). The mandate issued January 3, 2001 (Ex. G).

On June 7, 2001, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. H at 1–15). The trial court appointed counsel for Petitioner and held an evidentiary hearing on his claims (*see id.* at 119–73). Following the evidentiary hearing, the trial court denied the motion (*id.* at 61–94). Petitioner, through counsel, appealed the decision to the First DCA (*see* Exs. I, J, K). The appellate court affirmed per curiam without written opinion on August 8, 2003, with the mandate issuing August 26, 2003 (Exs. L, M). Rozelle v. State, 852 So. 2d 239 (Fla. 1st DCA 2003) (Table).[2]

On January 24, 2005, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800 of the Florida Rules of Criminal Procedure (Ex. N at 1–20). The trial court denied the motion (*id.* at 21–23). Petitioner appealed the decision to the First DCA, and the appellate court affirmed per curiam without written opinion on June 14, 2005, with the mandate issuing August 5, 2005 (Exs. P, Q). Rozelle v. State, 906 So. 2d 1064 (Fla. 1st DCA 2005) (Table).

On March 23, 2006, Petitioner filed a petition for writ of habeas corpus in the trial court (Ex. R at 1–65). The trial court dismissed the petition (*id.* at 66–67). Petitioner appealed the decision to the First DCA (*see* Exs. S, T), and the appellate court affirmed per curiam without written opinion on July 27, 2007, with the mandate issuing August 24, 2007 (Exs. U, V). Rozelle v. McDonough, 961 So. 2d 940 (Fla. 1st DCA 2007) (Table).

Petitioner filed the instant federal habeas action on August 31, 2007 (Doc. 5). Petitioner raises the following claims:

### ISSUE I

That constitutional violations that occurred in Petitioner's trial deprived the Petitioner of the right to a fair trial and due process of law in violation of the 5th, 6th and 14th Amendments of the United States Constitution, and resulted in the conviction of one who is actually innocent of the charge of second degree murder, which constituted a miscarriage of justice.

---

[2] The First DCA misspelled Petitioner's surname "Rozelle" instead of "Rozzelle" in its opinion and mandate.

<u>ISSUE II</u>

The prosecutor knowingly put false evidence before the jury, in reference to the altercation between the victim, Greg Paul Leier and Petitioner, denying Petitioner the right to a fair trial and due process of law, guaranteed by the 5th, 6th and 14th Amendments of the United States Constitution.

<u>ISSUE III</u>

The prosecutor knowingly made false statements to the court while arguing defense's motion for mistrial, which perpetrated a fraud on the court and violated Petitioner's right to due process of law, which is guaranteed under the 5th and 14th Amendments to the United States Constitution.

<u>ISSUE IV</u>

Conviction was obtained in violation of Petitioner's right to a fair trial and due process of law, guaranteed under the 5th, 6th and 14th Amendments to the United States Constitution when Police Officer Mary Blythe Williams presented false/perjured testimony to the jury.

<u>ISSUE V</u>

(A) Trial counsel was ineffective by failing to interview or depose the witnesses in which he based his defensive position.

(B) By failing to call exculpatory witnesses which would have enabled counsel to rebut false evidence presented by the prosecution and;

(C) Counsel failed to familiarize himself with the law and facts of the case, denying the Petitioner the right to effective assistance of counsel guaranteed under the 6th and 14th Amendments of the United States Constitution.

(Doc. 5 at 8–12).[3]

II.  ANALYSIS

Respondent contends the instant petition is untimely because it was not filed within the one-year limitations period set forth in 28 U.S.C. § 2244. Pursuant to § 2244, a one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment. The limitation period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Section 2244(d)(1).

Respondent contends Petitioner's conviction became final on March 15, 2001, upon expiration of the 90-day period for seeking certiorari review by the United States Supreme Court (Doc. 21 at 11–12). *See* Jimenez v. Quarterman, — U.S. —, 129 S. Ct. 681, 685–86, 172 L. Ed. 2d 475 (2009) ("... direct review cannot conclude for purposes of § 2244(d)(1)(A) until the availability of direct appeal to the state courts, and to th[e] [Supreme] Court [of the United States], has been exhausted."); Nix v. Secretary for the Dep't of Corrections, 393 F.3d 1235, 1237 (11th Cir. 2004) (holding that a Florida prisoner's conviction became final 90 days after the Florida district court of appeal affirmed his conviction); Bond v. Moore, 309 F.3d 770, 774 (11th Cir. 2002) (holding that a Florida prisoner's conviction became final 90 days after the Supreme Court of Florida denied his motion for rehearing).[4] Petitioner does not assert that a different statutory trigger for the limitations period applies (*see* Doc. 24).[5] Therefore, the undersigned concludes that Petitioner's conviction became final on March 15, 2001, upon expiration of the 90-day period for seeking certiorari review of the conviction by the United States Supreme Court. The federal limitations period expired one year later, on March 15, 2002. *See* Downs v. McNeil, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing Ferreira v. Sec'y, Dep't of Corr., 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)).

---

[4] The Supreme Court of the United States may grant a writ of certiorari to review the final judgment of "the highest court of a State in which a decision could be had." 28 U.S.C. § 1257(a); *see also* U.S. Sup. Ct. R. 13.1 (a petition for writ of certiorari may only be filed to review a judgment or order entered by a state court of last resort and must be filed within ninety (90) days of the action undertaken by such state court).

[5] Petitioner does not assert that he was prevented from filing his federal petition by a State-created impediment, nor does he assert that any of his claims are based upon newly recognized constitutional rights. Furthermore, Petitioner does not assert that the factual predicate of any of his claims could not have been discovered prior to March 15, 2001 (the date his conviction became final) through the exercise of due diligence. Indeed, the factual predicate for each of Petitioner's claims was available when his trial concluded, at the latest. Petitioner's claims are based upon facts included in law enforcement reports, witness statements provided to law enforcement, reports of a medical expert who testified at trial, pre-trial depositions, and the trial record. Petitioner has not shown that any of these materials were withheld from the defense or otherwise unobtainable with due diligence.

Petitioner did not file his federal petition on or before March 15, 2002; however, he may be entitled to habeas review if the limitations period was tolled pursuant to statutory tolling principles or if he qualifies for another exception to the time bar. Section 2244(d)(2) provides:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

In the instant case, the record shows that on June 7, 2001, Petitioner filed a Rule 3.850 motion (after 83 days of the federal limitations period expired). Respondent concedes this was a tolling post-conviction application (*see* Doc. 21 at 12). The motion was pending until August 26, 2003, upon issuance of the appellate court's mandate affirming the trial court's denial of the motion. *See* Nyland v. Moore, 216 F.3d 1264, 1267 (11th Cir. 2000) (where Florida petitioner appeals trial court's denial of post-conviction application, application remains pending until issuance of the mandate by the appellate court). The federal limitations period expired 282 days later on June 4, 2004. Petitioner subsequently filed applications for post-conviction relief; however, since the one-year limitations period had already expired, they did not toll the limitations period. *See* Webster v. Moore, 199 F.3d 1256, 1259 (11th Cir. 2000). Petitioner did not file his federal petition until August of 2007, over three years after the federal limitations period ran. Therefore, it was untimely.

Petitioner contends he should be allowed to proceed on the merits of his claims because he is actually innocent of the crime (*see* Docs. 7, 24). He contends he has made a threshold showing of innocence justifying review of his underlying constitutional claims pursuant to Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), and House v. Bell, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006). Therefore, he argues, dismissal of his petition for untimeliness would violate his rights under and the Suspension Clause of the United States Constitution (*see* Doc. 24 at 5–6).

Neither the Supreme Court nor the Eleventh Circuit has ever held that the Constitution requires an actual innocence exception to the AEDPA's one-year limitations period. *See* Melson v. Allen, 548 F.3d 993, 1002 (11th Cir. 2008) (citing Johnson v. Florida Dep't of Corr., 513 F.3d 1328, 1333 (11th Cir. 2008) ("To date, this Court has avoided this constitutional issue because no time-barred petitioner has made the requisite actual-innocence showing.")). Before reaching this question, the petitioner must first make a sufficient showing of actual innocence. *Id.* (citation omitted). This requires the petitioner to produce "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting Schlup, 513 U.S. at 324). If the petitioner shows "'that it is more

likely than not that no reasonable juror would have convicted him in the light of the new evidence,'" then he has made a "gateway" claim of innocence allowing his otherwise barred constitutional claims to be considered on the merits. *Id.* (quoting Schlup, 513 U.S. at 315, 327). The Schlup Court made several observations about this standard. With respect to the term "probably resulted," the Court clarified that, "[t]o establish the requisite probability, the petitioner must show that it is <u>more likely than not</u> that no reasonable juror would have convicted him in light of the new evidence." *Id.*, 513 U.S. at 327, 330 (emphasis added). With respect to the term "reasonable juror," the Court instructed: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.*, 513 U.S. at 329.

In evaluating the new evidence presented by a petitioner, a habeas court "'may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" Melson, 548 F.3d at 1002 (quoting House, 547 U.S. at 537). The court then assesses the likely impact of this new evidence on reasonable jurors. *Id.* (citing House, 547 U.S. at 538). The demanding nature of the Schlup standard ensures that only the "extraordinary" case will merit review of the procedurally barred claims. *Id.* (quoting House, *supra*). Additionally, it is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency. *See* Bousley v. United States, 523 U.S. 614, 623–24, 118 S. Ct. 1604, 1611–12, 140 L. Ed. 2d 828 (1998) (citing Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518–19, 120 L. Ed. 2d 269 (1992)).

Petitioner contends his "new evidence" negates the intent element of second degree murder, that is, that his beating of the victim was imminently dangerous to another and demonstrated a depraved mind without regard for human life (*see* Doc. 7).[6] Notably, Petitioner's "new evidence"

---

[6] According to the Florida Standard Jury Instructions in Criminal Cases, to prove the crime of second degree murder, the State must prove the following three elements beyond a reasonable doubt:

1. the victim is dead;

2. the death was caused by the criminal act of the defendant; and

3. there was an unlawful killing of the victim by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.

Fla. Standard Jury Instructions in Criminal Cases Part Two, ch. 7.4 (The Florida Bar 2007) (instruction adopted in 1981 and amended in 1997). The jury instructions define an act as "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:

1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and

Case No.: 3:07cv347/RV/EMT

does not refute the medical evidence presented at trial, including testimony from medical experts that the victim, Mr. Leier, died from blunt force head trauma consistent with a beating from a man's fist.[7] Also unrefuted is the evidence that within an hour after the beating, Mr. Leier became unconscious and was subsequently determined "brain dead" by medical personnel at the hospital.[8]

The first category of Petitioner's "new evidence" is evidence that he contends would have supported a "heat of passion" defense, including statements by Mr. Leier, Andrea Barnes (Petitioner's girlfriend), and Petitioner to law enforcement officers that Petitioner beat Mr. Leier

---

    2. is done from ill will, hatred, spite or an evil intent, and

    3. is of such a nature that the act itself indicates an indifference to human life.

*Id.* In order to convict of second degree murder, it is not necessary for the State to prove the defendant had an intent to cause death. *Id.*

[7] Dr. Glidden testified that he examined Mr. Leier upon his arrival at the hospital's emergency room on July 18, 1998, at approximately 10:00 p.m. (Ex. B at 291). He testified that Mr. Leier was unconscious and neurologically unresponsive upon his arrival at the emergency room (*id.* at 291–92) (the emergency medical technician testified that Leier lapsed into unconsciousness after only "a few minutes" of his questioning Leier at the motel (*see id.* at 157–60)). He further testified that he observed a lot of swelling, blood around Mr. Leier's mouth, and bruises on the left side of his chest (*id.* at 292–93). He testified that a CT scan revealed a massive brain injury, with a large area of blood in the skull compressing on the brain (*id.* at 293). He stated Mr. Leier's brain was "more or less like jello at that time, no form or function to it" (*id.* at 293–94). He testified that Mr. Leier's injuries were consistent with his being beaten by another person's fist (*id.* at 294).

Dr. Witkind, an expert in the field of neurosurgery, assumed care for Mr. Leier after Dr. Glidden provided emergency treatment. Dr. Witkind testified that Mr. Leier was badly bruised about the face, blood was coming from his mouth, he had a large contusion over his forehead which extended down over the base of his nose, and he was unconscious (*id.* at 299–300). He stated Mr. Leier was not breathing on his own, was completely unresponsive, and was "brain dead," meaning that his brain was not functioning (*id.* at 301–02). He testified that the CT scan showed massive bleeding on the left side of the brain and under the skull, which ran from the front of the skull all the way to the back on the left side (*id.* at 302). He stated Mr. Leier' brain was being severely depressed by this ball of blood, and the brain was losing its definition and falling apart from lack of blood supply (*id.*). Dr. Witkind testified that it was too late to save Mr. Leier (*id.*). He testified that Mr. Leier's injuries were consistent with a beating from a man's fists (*id.* at 304).

Dr. Berkland, an expert in the area of forensic pathology, testified that he performed an autopsy on Mr. Leier's body on July 20, 1998, at approximately 11:15 a.m. (*id.* at 310). He testified that Mr. Leier was 5 feet 9 inches tall and weighed 145 pounds (*id.* at 314). He stated he observed bruises around his eyes, on his face, around his mouth, and on his scalp, chest, both arms, both forearms, the back of his left hand, and his back (*id.* at 310). He also noted scrapes on Mr. Leier's right lower leg and ankle, and two bruises and a scratch on his left knee (*id.* at 311). Dr. Berkland testified that Mr. Leier's internal injuries included a bruise to the inside of the fat near his navel, which involved his pancreas, and a small amount of bleeding surrounding the bruise (*id.*). He stated that some of the bruises on Mr. Leier's body were very deep and extended into the underlying muscle tissue past the fat layer (*id.* at 312). Dr. Berkland testified that he observed a large blood clot on the left side of Mr. Leier's brain, which had pushed his brain down the hole at the based of the brain (*id.* at 313). He testified that the injuries were less than 48 hours old (*id.* at 312, 313–14). Dr. Berkland testified that Mr. Leier's injuries that resulted in his death were consistent with a beating from a man's fist, but the large bruise on the center of his chest and the large bruise on is upper left chest could have been caused by something other than a fist, for example, falling against a hard surface or being kicked with a man's foot (*id.* at 324–25). Berkland testified that Mr. Leier's head injuries were the result of "a fair amount of force," and Leier's blood/alcohol level (.402) was such that his motor responses, coordination, and reflex time were slowed (*id.* at 327–29).

[8] Although there was some dispute as to the exact time of the beating (a dispute of 15–20 minutes), by all accounts Mr. Leier became unconscious within an hour of the beating.

Case No.: 3:07cv347/RV/EMT

because he caught Mr. Leier and Ms. Barnes in a physically intimate encounter (the second encounter he had observed that day) and was angry (*see* Doc. 7 at 5–7).[9] Upon review of these statements and the trial transcript, the undersigned concludes that the substance of this "new evidence" was presented to the jury.

Petitioner's brother, Anthony Rozzelle, testified that he met Petitioner at a bar at 5:00 p.m. on the day of the killing (Ex. B at 258). He testified that he and Petitioner drank beer for an hour, and Petitioner told him that Ms. Barnes was drunk at the motel where they were staying (*id.* at 259). Mr. Rozzelle testified that he told Petitioner he should check on Ms. Barnes, so Petitioner left the bar (*id.*). Petitioner returned 15–20 minutes later and said he caught Ms. Barnes with another man, so he "knocked out" the man, "knocked out" Ms. Barnes, dragged Ms. Barnes by the hair to their room, and locked her inside (*id.* at 260–63). Mr. Rozzelle testified that Petitioner was not emotional when he relayed what he had done (*id.* at 262). Mr. Rozelle further testified that he and Petitioner drank beer and played pool until 9:00 p.m. and then left the bar (*id.* at 260). Rozelle testified that when he and Petitioner parted company, he told Petitioner to go back to the motel, get a good night's sleep, return home to Alabama, and "whatever you do, don't get in trouble and don't go to jail . . ." (*id.* at 261).

Additionally, the jury heard Petitioner's description of the events that occurred upon his return to the motel that night through his statements to Detective Joseph Michael during an interview after his arrest:[10]

> A [Petitioner]. . . . I got back in touch with my brother, and I met him at Charlie's. And I come back and I caught these two together. Well, I whupped his ass. I did. I did. I'm sorry. I got a mean left hook and he got about four of 'em."
>
> Q [Detective Michael]. Okay.
>
> A. And probably whupped her, too. I don't know. I threw her back in the room with him.

---

[9] These statements are included in the reports of Officer Burritt, Officer Williams, Detective Matz, and Detective Michael, which Petitioner submitted as exhibits to his supporting memorandum. Mr. Leier's statement to Officer Jack Burritt that he (Leier) was beaten because he "got caught with a woman" was included in Officer Burritt's written report (*see* Doc. 7, Ex. 5). Andrea Barnes' statement to Officer Mary Blythe Williams' that Petitioner caught her with a man next door and beat up him was included in Officer Williams' pre-trial deposition (*see* Doc. 7, Ex. 3). Ms. Barnes' statement to Detective Thomas Matz that Petitioner returned from visiting his brother and "became crazy" was included in Detective Matz's supplemental police report (*see* Doc. 7, Ex. 6). Petitioner's statement to Detective Joe Michael that he became enraged after he observed Ms. Barnes half-naked and embracing the victim, which was the second intimate encounter between the two that he had observed that day, was included in Detective Michael's investigative report (*see* Doc. 7, Ex. 7).

[10] Detective Joseph Michael testified that he interviewed Petitioner at the police station after his arrest and recorded the interview on audiotape (Ex. B at 351). The audiotape was admitted into evidence and published to the jury (*id.* at 354–72).

Case No.: 3:07cv347/RV/EMT

Q. Okay. Four o'clock you said was the first time you saw him?

A. Yeah — well, when I checked into the place that afternoon —

Q. Right.

A. — I sat there — we sat on the balcony and had a few beers and stuff, and I went in and got cleaned up.

Q. This was with him?

A. No. This was — I mean, yeah. Me and him and Andy [Ms. Barnes] — I mean his room was next to ours.

Q. Okay.

A. And we sat there on the balcony and stuff, and Andy went in there and called my brother and got everybody all tore up and pissed off and stuff. Well, I went back in and got ahold of him, and I met him at a bar, you know. And we sat there and — and when I come back to the place my old lady was in a shirt with her — you know, that comes up to about here with no Goddamn britches on underneath it, and she's rubbing all over this thing. And I sat here in the parking lot and see this and —
. . . .

Q. They were out on the balcony?

A. Yeah. And I just proceeded to walk up and I whupped his ass and I slapped her — I backhanded her probably. I don't know, I just —
. . . .

Q. Okay. You said something about you put her back in his room or y'all's room?

A. No, I drug her ass out and put her in his.
. . . .

A. I just caught my old lady with another guy —

Q. I understand.

A. — and I kicked his ass and hers, too, and that's the bottom line. And that's all I got to say.
. . . .

A. I whupped his ass. I know I did. I know I did. I put a whupping on his ass; hers, too.
. . . .

Q. Was this —

A. I love this woman.

(*id.* at 360–62, 365).

Case No.: 3:07cv347/RV/EMT

The jury also heard Officer John Burritt's testimony that when he and Petitioner walked past Mr. Leier's motel room after the beating, Petitioner looked at Leier and stated, "That's right, you motherf[]r, I kicked your ass, I caught you f[]ing my old lady, I kicked your ass." (Ex. B at 148). Officer Burritt testified that as he transported Petitioner to the police station after his arrest, Petitioner stated two or three times, "I caught that guy f[]ing my old lady and I beat the hell out of him. I'm from the old school and he had it coming." (*id.* at 150, 151). Review of the trial record thus demonstrates that the jury heard evidence that was substantively the same as the statements of Mr. Leier, Ms. Barnes, and Petitioner included in the reports of Officer Burritt, Officer Williams, Detective Matz, and Detective Michael.

The next category of Petitioner's "new evidence" is evidence that he contends negates the intent element of second degree murder because it refutes the evidence that he inflicted an extended beating on Leier and shows that the beating lasted "only seconds" and occurred before he (Petitioner) went to the motel office to obtain an extra key to his room (Doc. 7 at 14–23). This "new evidence" includes written witness statements of Adley Boudreaux (a guest at the motel) and Wesley Rosnick (the motel's front desk employee) provided to law enforcement the night of the murder and the day after (*see* Doc. 7 at 14–23, Exs. 9, 10).

Mr. Boudreaux's written statement to law enforcement includes the following observations:

> We left the motel at approx. 6:00 p.m. to eat and shop. We returned to our room at approx. 8:15 p.m., changed our clothes and went to the pool at approx. 8:30 p.m. We actually got in the pool for a while & sat there for approx. 10–15 minutes.
>
> The W/M (identified as the barefoot one with jeans) drove into the parking area next to the pool, parked the car he was driving, got out and walked upstairs to the western-most room. He started pounding on the door screaming "open the door let me in."
>
> At this point I got out of the pool, started picking up our things and walked to where I could see which door and room he was pounding on and whom he was yelling at. The door to the western-most room was closed at that point.
>
> I handed Dawn our room key and she started walking to our room. I was still able to see the W/M.
>
> The W/M continued for approx. 1 minute, steadily pounding on the door and raising his voice, yelling at them to let him in—open the door.
>
> The door eventually opened and the W/M entered the room. I heard a female yelling stop, stop, leave him alone.
>
> I walked out of the gate of the pool area and started walking to our room.

>The W/M who had been in the room (the same one who had been beating on the door and yelling) walked down the stairs, across the parking lot away from me and towards the office area. I saw him grab the office door and enter the office. By that time I was in my room closing my door.
>
>We dried off, changed our clothes, & sat and watched approx. 20 minutes of a movie. We then started hearing sounds that sounded as if a body were being thrown against the room wall to the west of us. We turned down the TV so we could identify and hear the sound better. We heard the sound as described above approx. 7 or 8 times in succession. This was at approx 9:15 p.m.
>
>Approx. 15 minutes later we heard the Law Enforcement and Medical sounds of arrival and assistance and realized there had been a problem somewhere, went outside, and were eventually were [sic] contacted by Officers.

(Doc. 7, Ex. 9).

Wesley Rosnick's statement states the following:

>At about 9 p.m. I had a crowded office and the gentleman in 225 blurted out that he needed an extra key for the room. At about the time the gentleman was leaving or a few seconds afterwards the gentleman in 226 called the office asking for security. I asked if he wanted police he said that all he needed was someone from the office to come over to his room so I sent Harish. Harish came back and said gentleman [sic] in 226 was bleeding so we called the police.

(*see* Doc. 7, Ex. 10). Mr. Rosnick provided substantially the same information in his pre-trial deposition (*id.*).

Review of the trial transcript demonstrates that the jury heard the substance of Mr. Boudreaux and Mr. Rosnick's statements through Mr. Boudreaux's testimony, the testimony of Harish Chauhan (an employee of the motel where Mr. Leier was killed), and Petitioner's recorded statement to police. Although Mr. Boudreaux's trial testimony indicates he was a bit confused as to the precise sequence of events he observed on the night of the murder, he affirmed that the information he provided in his written statement to law enforcement (which was used by the prosecution and defense to refresh Boudreaux's recollection) was accurate, including that he heard a woman yelling "stop, stop, leave him alone" before he saw Petitioner go to the motel office (*id.* at 198–230).

Mr. Chauhan testified that the guest in Room 226 (Mr. Leier) telephoned Wesley Rosnick at the front desk and asked for security (Ex. B at 164–66). Mr. Chauhan testified that Mr. Rosnick told him (Chauhan) to respond to Room 226 and also to respond to a call regarding Room 121 (*id.* at 166). Mr. Chauhan testified that as he was responding to Room 121, the guest in Room 226 saw him and walked down the stairs to the ground floor (*id.* at 166–67). Chauhan testified that he saw

that the man had a bloody face, and the man told him he wanted to call the police (*id.* at 167–68). Chauhan testified that he returned to the lobby and asked Mr. Rosnick to call the police (*id.* at 168).

Officer Burritt testified he was dispatched to the motel at 9:26 p.m. and arrived there at 9:28 p.m. (*id.* at 140). He stated that as he stepped out of his patrol car, he heard a voice say, "I'm over here," and then Mr. Leier approached him from the shadows on the ground floor of the motel (*id.* at 140, 142).

In Petitioner's recorded statement, he described that the police responded to the motel not long after the beating:

> Q. Okay. Let me ask you this. Do you remember how long it was before — you know, when this took place, how long was it before when [sic] the officers came?
>
> A. Oh, they were there pretty quick.
>
> Q. Were they?
>
> A. Probably 15 minutes.
>
> Q. Okay.
>
> A. From the time that I went down there to the room and got me another hotel key to get into my room, they were there probably two or three minutes after that.
>
> Q. Okay. What did she do, go in and lock the door?
>
> A. Andy went in my room and locked the door, yeah.
>
> Q. Okay. Yeah, that's what I'm saying. You had to go down and get another key?
>
> A. Yeah.

(*id.* at 368–69) (emphasis added). This demonstrates that the jury heard evidence that the beating occurred before Petitioner went to the motel office to obtain an extra key to his room.

Petitioner next presents "new evidence" that he beat Mr. Leier with only his fists, including his own statements and Mr. Leier's statements included in law enforcement reports (*see* Doc. 7, Exs. 5, 7). Petitioner contends this "new evidence," in conjunction with Dr. Berkland's trial testimony that some of Leier's injuries were larger than could have been created with a fist, creates reasonable doubt that his beating of Leier caused his death (*see* Doc. 7 at 20–21).

According to the trial transcript, Dr. Berkland, the medical examiner, testified that Mr. Leier's injuries that resulted in his death <u>were</u> consistent with a beating from a man's fist, but the large bruise on the center of his chest and the large bruise on his upper left chest could have been

caused by something other than a fist, for example, falling against a hard surface or being kicked with a man's foot (Ex. B at 323–25).

The trial transcript also demonstrates that the jury heard the statements of Mr. Leier and Petitioner which Petitioner characterizes as "new evidence." The jury heard Petitioner's recorded statement to Detective Michael which included the following:

> Q [Detective Michael]. Did you just use your hands?
> A [Petitioner]. That's it.
> Q. Nothing else?
> A. Nothing else. I don't need anything else.
> Q. You just used your hands?
> A. No.
> Q. You didn't use any weapons or nothing [sic]?
> A. No.
> Q. You didn't pick up anything and hit him?
> A. No, a couple of good left hooks.
> Q. A couple of good left hooks.
> A. Yeah, probably three or four.
> Q. Okay.
> A. A couple of right crosses, too.

(*id.* at 365). Additionally, Brian Hughes, an emergency medical technician who was dispatched to the motel after the beating, testified that during the process of assessing Mr. Leier's injuries, he asked Leier what had happened to him, and Leier responded that he was beaten up (Ex. B at 158). Hughes asked him what he was hit with, and Leier responded "fist" (*id.* at 158–59). Hughes asked Leier if he was hit with any other objects, and Leier responded no (*id.* at 159). The trial record thus demonstrates that the jury heard Mr. Leier's and Petitioner's statements that Petitioner beat Leier with only his fists.

Petitioner's final category of "new evidence" is medical records documenting Andrea Barnes' injuries. Petitioner contends this evidence refutes Officer Williams' testimony that Petitioner "knocked out" Barnes' teeth, which Petitioner suggests misled the jury to believe that his attack on Barnes and Leier was executed with a higher degree of intent (*see* Doc. 7 at 26–30, Ex. 2).

The trial record shows that Officer Williams described Ms. Barnes' injuries, which she observed at the motel, as follows: "She had blood all over her face, around her nose, her teeth had been knocked out to just below the gumline. There was just a little tiny bit of white showing up

underneath her gumline." (Ex. B at 174). Officer Burritt testified that he also observed Ms. Barnes at the motel and saw that she was bleeding, had her hand over her mouth, and had blood on her hands and blood in the area under her chin (*id.* at 147). Detective Matz, who observed Ms. Barnes after she was released from the hospital, testified that he observed a bruise around Ms. Barnes' right eye, redness on the right side of her neck, and her arm in a sling (*id.* at 233–34). Additionally, Detective Matz identified three photographs of Ms. Barnes that were admitted as exhibits at trial and published to the jury (*id.* at 26–28, 240, 242–45). He described Exhibit 3A as showing abrasions on the right side of her neck and around her eye, Exhibit 3B as showing her right eye, and Exhibit 3C as showing her right eye and the top of her bottom lip (this particular photograph is a close-up of Ms. Barnes' face and shows her upper teeth). The medical records submitted by Petitioner as "new evidence" documented Ms. Barnes' injuries as a laceration to her upper lip and a fracture at the tip of her left clavicle (Doc. 7, Ex. 2).

The fracture to Ms. Barnes' clavicle, evidence of which was not presented to the jury for consideration, was as damaging to the defense, with regard to the issue of intent, as broken teeth, if not more so. Furthermore, it is obvious that the medical records did not document all of Ms. Barnes' injuries, since the photographs taken after she left the hospital clearly show marks on her neck, and those injuries are not documented in the medical records. Therefore, Petitioner has failed to show that the jury's considering the medical records would have been favorable to the defense or likely would have resulted in a different verdict.

Upon consideration of all of Petitioner's "new evidence," most of which was cumulative of evidence presented to the jury at trial, and the overwhelming evidence supporting the jury's verdict convicting Petitioner, Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him of second degree murder had the jury heard the "new evidence." *See* Mize v. Hall, 532 F.3d 1184, 1194 (11th Cir. 2008) (petitioner failed to demonstrate there was a reasonable probability that, had "new evidence" been disclosed to defense, result of trial would have been different where "new evidence" would have been at best cumulative). Therefore, Petitioner has failed to demonstrate that a fundamental miscarriage of justice would result from this court's failure to review the claims presented in his untimely federal petition.[11]

III.   CERTIFICATE OF APPEALABILITY

---

[11] Because Petitioner's new evidence does not even meet the Schlup standard, which is a less difficult standard to meet than the burden of proof for a freestanding actual innocence claim, his new evidence *a fortiori* does not establish a freestanding actual innocence claim, to the extent he asserts one as Ground One (*see* Doc. 5 at 8). *See* Mize, 532 F.3d at 1195–96, 1198. Moreover, Eleventh Circuit precedent forbids granting habeas relief based upon a claim of actual innocence in non-capital cases. *See* Jordan v. Sec'y Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007) (citations omitted).

Case No.: 3:07cv347/RV/EMT

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1.  That the petition for writ of habeas corpus (Doc. 5) be **DISMISSED** with prejudice as untimely.

2.  That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 24th day of May 2010.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**